UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ANNA BEAULIALICE,
*and all similarly situated individuals*,

       Plaintiff,

v.   Case No. 8:04-cv-2316-T-24-EAJ

FEDERAL HOME LOAN
MORTGAGE CORPORATION,

       Defendant.

_____/

**ORDER**

This cause comes before the Court on Defendant Federal Home Loan Mortgage Corporation's Motion for Summary Judgment in which it argues that Plaintiff Anna Beaulialice's disparate impact claims under the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, ("FHA") and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691, *et seq.*, ("ECOA") are barred by the applicable statutes of limitation.  (Doc. No. 74.)  Alternatively, Defendant argues that Plaintiff cannot prove causation or a prima facie case.  In response, Plaintiff argues that genuine issues of material fact remain regarding whether Defendant's Loan Prospector system has a disparate impact on minority home loan applicants in violation of the FHA and ECOA.  (Doc. No. 80.)  With the Court's permission, Defendant filed a reply brief in support of its Motion.  (Doc. No. 92.)  For the reasons stated herein, Defendant's Motion is granted.

I.      **Facts and Procedural History**

Plaintiff Anna Beaulialice, a Black woman of Hispanic origin, is the representative of a putative class of minority consumers who allegedly have been harmed by the discriminatory practices of Defendant Federal Home Loan Mortgage Corporation, also known as "Freddie Mac." (Pl.'s Am. Compl., p. 1-2.)  In particular, Plaintiff contends that the alleged discrimination occurred when Defendant's automated underwriting software, known as the Loan Prospector system, returned a "caution" in response to a submission relating to Plaintiff's application for a mortgage loan to SouthTrust Mortgage Corporation ("SouthTrust").  (*Id.*)  Plaintiff alleges that, as a result of Defendant's discriminatory Loan Prospector system, she was denied an $85,000 residential home mortgage loan and instead was required to accept less favorable lending terms than would have been extended to a non-minority applicant.  (*Id.*)

A.      **Defendant's Loan Prospector System**

Defendant Federal Home Loan Mortgage Corporation was created by Congress to help provide liquidity to the residential mortgage market by purchasing home mortgage loans from originating lenders.  *See* 12 U.S.C. §§ 1451, Pub. L. No. 91-351, § 305 (1970). Defendant is prohibited by statute from originating mortgages and participates exclusively in the secondary mortgage market.  12 U.S.C. § 1454(a)(5).  To further its public mission, Defendant developed a computerized underwriting software called Loan Prospector ("LP") that it licenses to mortgage lenders. (Doc. No. 80, Ex. M at 28.)  Mortgage lenders using LP agree to the terms of use set forth in the "Single-Family Seller/Servicer Guide."  (Doc. No. 80, Ex. E.)

To use LP, a lender submits application and credit report data to the system.  The system returns an assessment of the terms under which Defendant would likely purchase the prospective

2

mortgage, if it is made by the lender. An "accept" response indicates that Defendant would likely be willing to purchase the loan without additional credit underwriting. A "caution" response indicates that the lender must further underwrite the mortgage if it wishes to sell the mortgage to Defendant. LP's underwriting software includes two principal sections: (1) an algorithm, or "scorecard," that weighs different factors to derive an LP score, and (2) separate decisional rules, known as "overrides," that apply individually without reference to the scorecard or each other. A "caution" response can result from either the scorecard or the overrides. (Doc. No. 80, Ex. E; Doc. No. 74, Ex. J.)

  **B.** **Plaintiff's Loan Application**

In May of 2002, Plaintiff contacted Sean Stockell, a senior loan officer with SouthTrust, seeking pre-approval for a mortgage loan for $80,000 to purchase a residence located at 13717 Coronado Dr., Spring Hill, Florida. (Stockell aff. at 1-2; Pl.'s dep., Ex.B-7.) On May 17, 2002, Stockell informed Plaintiff that she had been pre-approved for a 30-year fixed rate mortgage in an amount up to $80,000. (Pl.'s dep., Ex.B-7.) Plaintiff completed a formal application for an $80,000 mortgage loan with SouthTrust on July 3, 2002. (Pl.'s dep., Ex. B-10.)

On July 8, 2002, SouthTrust submitted the information about Plaintiff's proposed loan to Defendant's LP system. (Doc. No. 74, Ex. J, L) The LP system returned a "caution" because Plaintiff's credit reports showed that she had an open bankruptcy. (*Id.* at Ex. L) Plaintiff was familiar with the loan approval process, as she had numerous problems in the past because her daughter's bankruptcy and other derogatory information had been reported as her own.[1] (Pl.'s

---

[1] In fact, in September 2002 and March 2004, Plaintiff sued all three major credit reporting agencies, asserting that their mistakes and inaccuracies on her credit report caused her to be denied credit. (Doc. No. 74, Exs. A-C.)

dep. at 51-52.) Stockell explained to Plaintiff that the "caution" response meant that her loan would have to be "manually underwritten." (Stockell aff. at 3.)[2] "[M]anual underwriting" is a process where the lender undertakes "a manual evaluation of applicable and pertinent information relating to Borrower['s] credit reputation and capacity to repay." (Doc. No. 80, Ex. E at 37-2.) Manual underwriting is required for all mortgages that are submitted to the LP system and receive a "caution" rating. (*Id.*)

Stockell then submitted Plaintiff's loan application to SouthTrust's underwriter, Kathy Elder, who was responsible for determining whether Plaintiff's application met SouthTrust's underwriting guidelines, ie., whether SouthTrust would be willing to make a loan and on what terms. (Elder decl. at 1-2.) According to Stockell, due to the "caution" response from the LP system, and at the direction of the underwriter, SouthTrust would loan Plaintiff no more than $63,900.[3] (Stockell aff. at 2.) To complete the underwriting process, SouthTrust required that Plaintiff provide additional information to clarify her credit history and to correct the errors on

---

[2]Shortly thereafter, on July 10, 2002, Plaintiff sent letters to all three major credit reporting agencies disputing items on her credit report. (Doc. No. 74, Ex. M; Pl.'s dep. at 131-32, 135-37.)

[3]Defendant argues that it was the open bankruptcy on Plaintiff's credit history–not the "caution" response from its LP system–that caused SouthTrust to agree to loan Plaintiff only $63,900. Defendant filed a declaration by the underwriter, Kathy Elder, in which she states the following: "[I]f there is significant inaccurate information in the credit report information submitted to LP, the lender is required to disregard the LP response–whether it is an 'accept' or a 'caution'–and manually underwrite the loan instead." (Elder decl. at ¶ 8.) Furthermore, she states that "[t]he caution response from LP had no bearing on the terms that [she] approved with respect to the loan to Ms. Beaulialice. The LP feedback was void as a result of the inaccurate credit data; [her] decisions were based strictly on [her] manual underwriting of the loan." (*Id.* at ¶ 12.)

her credit reports. (Pl.'s dep. at 156-58.) In addition, Plaintiff discussed with Stockell the possibility of borrowing only $41,000. (*Id.* at 161.)

During the month of October 2002, SouthTrust processed Plaintiff's loan information through the LP system five additional times. (Doc. No. 80, Ex. L at Ex. 8.) On October 2nd and 3rd, SouthTrust processed her information for a loan in the amount of $41,000. (*Id.*) On October 23rd, SouthTrust twice processed her information for a loan in the amount of $63,900, and once for a loan in the amount of $53,900. (*Id.*) In each instance, the LP system returned a "caution" response.[4] (*Id.*)

Ultimately, on October 31, 2002, SouthTrust loaned Plaintiff $63,900, and Plaintiff purchased the Coronado Drive property as her "primary residence."[5] (Pl's dep. at B-24, B-26, B-27.) Plaintiff later testified that she purchased the property for her daughter to live in, and that, although she indicated on her mortgage application that the home was to be her primary residence, her daughter would be living there.[6] (Pl.'s dep. at 84, 178-79.)

---

[4] On October 11, 2002, Plaintiff's attorney, James Francis, sent SouthTrust a letter advising the company that he represented Plaintiff in civil litigation relating to the errors in her credit reports and that "the [erroneous] bankruptcy history has resurfaced in connection with a mortgage application she has made with SouthTrust." (Doc. No. 74, Ex. D.)

[5] According to underwriter Kathy Elder, Plaintiff's representations that the property was to be her primary residence were important in the underwriting and approval of the loan. (Elder decl. at ¶ 11-12.) In fact, Elder requested specific, additional support from Plaintiff to show that she would occupy the home as her primary residence. (*Id.*) "Homes that a borrower does not intend to occupy as a primary residence or second home are referred to in the mortgage industry as 'non-owner occupied' or 'investor' mortgages. Investor mortgages are far riskier than owner-occupied mortgages, and thus are not eligible for the same loans as owner-occupied properties." (*Id.*) According to Elder, Plaintiff's application would not have been approved and she would not have been eligible for the subject loan, if it had been presented as an investment mortgage. (*Id.*)

[6] In her affidavit dated September 20, 2006, Plaintiff stated that she intended to live in the Coronado Drive property "at some point" after selling her then-current residence in Lutz,

### C. Plaintiff's Class Action Complaint

On October 21, 2004, Plaintiff filed a class action Complaint against Defendant, alleging violations of the Fair Housing Act and the Equal Credit Opportunity Act. (Pl.'s Compl., Pl.'s Am. Compl.) Plaintiff alleges that Defendant's automated underwriting and credit scoring system is inherently discriminatory in that it contains racially discriminatory assumptions that are embedded in the statistical formulas utilized to derive the underwriting decision. (*Id.* at 9-10.)

As evidence that Defendant's LP system, particularly the bankruptcy override, imposes a disparate impact on minorities, Plaintiff has filed an expert report by Professor Peter Nigro, who is an economist and the Sarkisian Chair in Financial Services and Associate Professor of Finance at Bryant University's School of Business in Smithfield, Rhode Island. (Doc. No. 80, Ex.O at 1.) In his report, Professor Nigro concludes that "[Defendant's] use of bankruptcy as an 'override' has a disparate impact on minorities." (*Id.*) He further concludes that "there is no business justification for [Defendant] to use a bankruptcy override in the manner that it does, given the disproportionate effect that particular override has on minority loan applicants." (*Id.* at 34.) He believes that "there are other statistically significant ways [Defendant] could predict foreclosure risk without resorting to such a discriminatory system." (*Id.*)

## II. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving

---

Florida. (Pl.'s aff. at 1-2.) However, her plans changed when her companion was killed in a car accident in 2003, and she decided instead to move to Georgia. (*Id.*)

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S. Ct. at 2554. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim. *See id.* When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial. *Id.* at 324, 106 S. Ct. at 2553.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988) (per curiam). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

**III.     Discussion**

Defendant moves for summary judgment on multiple grounds: (1) that Plaintiff's claims are barred by the applicable statutes of limitation; (2) that Plaintiff cannot prove the necessary causal link between Defendant and the alleged discrimination; (3) that Plaintiff cannot establish a prima facie case of disparate impact or that the bankruptcy override does not serve a legitimate, non-discriminatory business objective; (4) that the ECOA is inapplicable because Plaintiff is not an "applicant" and Defendant is not a "creditor"; and (5) that neither the ECOA nor the FHA authorize a disparate impact claim. (Doc. No. 74.)

**A.     Whether the ECOA and the FHA Authorize a Disparate Impact Claim**

The Court begins with Defendant's argument that the ECOA and the FHA prohibit only intentional discrimination and that neither statute authorizes a claim based on a disparate impact theory. Defendant argues that Congress chose to limit claims under the ECOA and the FHA to claims involving only intentional discrimination because, unlike Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA"), the ECOA and the FHA do not speak in terms of the "effects" of a practice or of practices that adversely "affect" applicants because of their race. Furthermore, Defendant argues that *Smith v. City of Jackson*, 544 U.S. 228, 125 S. Ct. 1536, 161 L. Ed. 2d 410 (2005), and *Alexander v. Sandoval*, 532 U.S. 275, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001), indicate that disparate impact claims are not authorized by either statute.

8

The U.S. Supreme Court has not yet addressed whether the disparate impact theory is cognizable under the ECOA or the FHA.[7] However, the Eleventh Circuit held that "the [FHA] prohibits 'not only direct discrimination but practices with racially discouraging effects . . .'; thus, a showing of a significant discriminatory effect suffices to demonstrate a violation of the [FHA].'" *Jackson v. Okaloosa County*, 21 F.3d 1531, 1543 (1994) (quoting *United States v. Mitchell*, 580 F.2d 789, 791 (5th Cir. 1978)); *see also United States v. Marengo County Commission*, 731 F.2d 1546, 1558 n.20 (11th Cir. 1984) (noting that the FHA "prohibits conduct having a significant discriminatory effect, without proof of discriminatory intent"). With respect to the ECOA, the Fifth Circuit has stated in dicta that the "ECOA regulations endorse [the] use of the disparate impact test to establish discrimination." *Haynes v. Bank of Wedowee*, 634 F.2d 266, 269 n.5 (5th Cir. Unit B Jan. 1981) (citing 12 C.F.R. § 202.6(a)[8]). Neither *Smith v. City of Jackson*, 544 U.S. at 232, 125 S. Ct. at 1540 (holding that the ADEA authorizes recovery in disparate impact cases) nor *Alexander v. Sandoval*, 532 U.S. at 293, 121 S. Ct. at 1523 (ruling that there is no private right of action to enforce disparate impact regulations promulgated under Title VI of the Civil Rights Act of 1964) prohibit disparate impact claims under either statute. Therefore, in light of this precedent, the Court concludes that Plaintiff may bring a disparate

---

[7]*See 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia,* 444 F.3d 673, 679 (D.C. Cir. 2006) ("The Supreme Court has yet to consider the availability of disparate impact claims under the FHA."); *Golden v. City of Columbus*, 404 F.3d 950, 963 (6th Cir. 2005) ("[T]he Supreme Court . . . [has not] previously decided whether disparate impact claims are permissible under ECOA. However, it appears that they are.").

[8]Part 202.6(a) of the Code of Federal Regulations, a regulation which interprets the ECOA, states: "The legislative history of the Act indicates that the Congress intended an 'effects test' concept, as outlined in the employment field by the Supreme Court in the cases of *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), and *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness." 12 C.F.R. § 202.6(a) n.2.

impact claim under the FHA, and assumes without deciding that she may bring such a claim under the ECOA.

### B. Whether Plaintiff's Claims Are Barred by the Applicable Statutes of Limitation under the ECOA and FHA

Defendant asserts that Plaintiff's claims are barred by the applicable two-year statutes of limitation for ECOA and FHA claims because she filed suit more than two years after the Loan Prospector system first returned a "caution" on her application to SouthTrust. Defendant asserts that in order for Plaintiff's suit to be timely, the alleged discrimination must have occurred on or after October 21, 2002 because Plaintiff filed suit on October 21, 2004. Defendant asserts that there are five key facts that demonstrate that Plaintiff's claims accrued before October 21, 2002: (1) On July 8, 2002, SouthTrust submitted the information about the requested loan to LP, which returned a "caution;" (2) Two days after Plaintiff learned that she would not receive the loan terms she sought, she wrote letters to the credit reporting agencies about errors on her credit reports; (3) Plaintiff retained James Francis, one of her current lawyers, during the summer of 2002; (4) In September 2002, Plaintiff filed two lawsuits against the major credit reporting agencies based in part on her dealings with SouthTrust; and (5) On October 11, 2002, Plaintiff's counsel, James Francis, wrote a letter to SouthTrust and to Sean Stockell, advising that the bankruptcy on her credit report was an error that should not affect her ability to get credit from SouthTrust.

Plaintiff argues that the continuing violations doctrine is applicable to claims made under the ECOA and FHA, and that her complaint is timely because she is not challenging just one incident, but rather, an unlawful practice that continued to occur well into the two-year limitations period. Plaintiff submits that each time Defendant processed her credit information

through its discriminatory LP system, it committed a new violation, and a cause of action under the ECOA and FHA accrued. She argues that SouthTrust last processed her information through the LP system on October 23, 2002, a date which is within the two-year limitations period.

Defendant replies that the October 23rd submission does not, and cannot, form the basis of Plaintiff's claims because that LP submission indicates a desired loan amount of $63,900, and Plaintiff received a loan in that exact amount from SouthTrust. Furthermore, Defendant argues, the continuing violation doctrine does not mean that a discrete act within the limitations period renders timely claims that relate to acts outside the period. According to Defendant, the only LP submission that references an amount greater than the amount that was actually loaned to Plaintiff was the submission on July 8, 2002, which is significantly more than two years before Plaintiff filed her complaint.

Claims under the ECOA and the FHA are subject to a two-year statute of limitations. 15 U.S.C. § 1691e(f) ("No such action shall be brought later than two years from the date of the occurrence of the violation . . . ."); 42 U.S.C. § 3613(a)(1)(A) ("An aggrieved person may commence a civil action . . . not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice . . . whichever occurs last . . . ."). Plaintiff filed her Complaint in this case on October 21, 2004. (Doc. No. 1). Ordinarily, in order for Plaintiff's suit to be timely, the alleged discrimination must have occurred on or after October 21, 2002. However, "[t]he continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period." *Center for*

*Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006).[9] Here, the alleged discriminatory conduct began when Defendant's LP system first returned a "caution" on Plaintiff's requested loan on July 8, 2002, which was more than two years before Plaintiff filed suit. According to Plaintiff, the discriminatory conduct continued into the limitation period, when her information was last processed through the LP system on October 23, 2002.

"The continuing violation doctrine is premised on the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated." *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1222 (11th Cir. 2001) (quotations and citations omitted). "If an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine to overcome the statutory requirement of filing [suit] with respect to that event or series of events." *Id.* (quotations and citations omitted).

The Court concludes that Plaintiff cannot rely on the continuing violation doctrine to sue on her otherwise time-barred claims. The record reveals that Plaintiff was aware of her cause of action under the ECOA and FHA as early as July 8, 2002, when the LP system first returned a "caution." Immediately after learning that she was denied the loan on the terms she requested,

---

[9]The Court concludes that the continuing violation doctrine is applicable to claims under the FHA. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81, 102 S. Ct. 1114, 1125, 71 L. Ed. 2d 214 (1982) ("[W]here a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within [two years] of the last asserted occurrence of that practice."). However, Plaintiff has not cited, and the Court has been unable to find, any controlling authority that has applied the doctrine to ECOA claims. Therefore, for this additional reason, the Court concludes that Plaintiff's ECOA claims are untimely.

on July 10, 2002, Plaintiff wrote letters to the credit reporting agencies and retained a lawyer. (Doc. No. 74, Ex. M; Pl.'s dep. at 131-132, 135-37.)  By September 2002, Plaintiff had already sued two major credit reporting agencies based in part on her dealings with SouthTrust.  (Doc. No. 74, Exs. A-C.)  On October 11, 2002, Plaintiff's lawyer wrote a letter to SouthTrust and to Sean Stockell, advising that the bankruptcy on her credit report was an error.  (Doc. No. 74, Ex. D.)  Accordingly, the Court concludes that the statute of limitations began to run as soon as Plaintiff was aware of her causes of action, which occurred sometime before October 21, 2002, and that the limitation period expired before Plaintiff filed suit.  Therefore, Plaintiff's action is barred by the two-year statutes of limitation.  *See Hous. Opportunities Project for Excellence, Inc. v. Key Colony No. 4 Condo. Assoc., Inc.*, No. 06-20129, 2007 U.S. Dist. LEXIS 1911, at *16-17 (S.D. Fla. Jan. 10, 2007) (refusing to apply the continuing violation doctrine and dismissing plaintiff's FHA claims because a reasonably prudent person in her position would know that she had a cause of action against defendants when she filed a related fair housing complaint against them, long before the filing of the instant suit).

      Furthermore, the only acts that occurred within the two-year period before Plaintiff filed suit–the three October 23, 2002 submissions to the LP system–cannot form the basis of Plaintiff's suit because SouthTrust approved a loan in an amount equal to (and greater than) the amount requested in those submissions.  On that date, SouthTrust twice processed Plaintiff's information for a loan in the amount of $63,900, and once for a loan in the amount of $53,900.  (Doc. No. 80, Ex. L at Ex. 8.)  Plaintiff received a loan for $63,900.  (Pl.'s dep. at B-24, B-26, B-27.)  Having received the requested loan amount of $63,900, Plaintiff was not injured by the use

13

of the LP system on October 23, 2002, and therefore, she cannot rely on those submissions to support her FHA and ECOA claims.

        **C.**     **Whether Defendant's Conduct Caused Plaintiff's Injury**

The Court next considers Defendant's alternative argument that Plaintiff cannot prove the necessary causal link between Defendant and the alleged discrimination. Defendant asserts that any injury suffered by Plaintiff resulted not from any act by Defendant, but from either SouthTrust, who denied her a loan on the terms she requested, or the credit reporting agencies, who erroneously reported a bankruptcy on her credit history. Furthermore, Defendant argues that Plaintiff knowingly and intentionally lied on her loan application by representing that the Coronado Drive property would be owner-occupied, when she never intended to live there. This misrepresentation, Defendant asserts, bars any discrimination claim.

Plaintiff responds that the "caution" response from Defendant's LP system played a significant, if not deciding, role in SouthTrust's decision to loan her $63,900 instead of $80,000, and therefore, at the very least, there is an issue of fact regarding whether Defendant caused her injury. Furthermore, Plaintiff disputes Defendant's characterization of the record and denies that she ever testified that she did not intend to occupy the Coronado Drive property. And, even if Plaintiff had not intended to occupy the residence, Defendant's "unclean hands" argument fails because her alleged misrepresentation is not directly related to her discrimination claim and did not injure Defendant.

        **1.**     **Whether Plaintiff Has Demonstrated a Causal Connection Between Her Injury and Defendant's Conduct.**

To survive a motion for summary judgment, the plaintiff must present facts demonstrating an "injury in fact," a "causal connection," and "redress[ability]." *See Region 8*

*Forest Serv. Timber Purchasers Counsel v. Alcock*, 993 F.2d 800, 805 (11th Cir. 1993). To demonstrate a causal connection between the injury and the conduct complained of, the plaintiff must show that the injury is "'fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992)). The causation requirement, however, "does not exclude injury produced by [the defendant's] determinative or coercive effect upon the action of [a third party]." *Bennett v. Spear*, 520 U.S. 154, 169, 117 S. Ct. 1154, 1164, 137 L. Ed. 2d 281 (1997).

Plaintiff relies heavily on Sean Stockell's statement that "[Defendant's] underwriting requirements played a significant if not deciding role in SouthTrust's decision to offer [Plaintiff] a loan for $63,900 instead of $80,000." (Stockell aff. at 4.) Stockell further states that "it was the Loan Prospector caution that impacted SouthTrust's underwriter's decision to manually underwrite the loan and lower the Loan to Value ratio." (*Id.* at 3.) The Court doubts that Stockell had personal knowledge on which to base this statement, given that he admits that it was the underwriter's decision–not his decision–whether to grant Plaintiff a loan and on what terms. *See* Fed. R. Civ. P. 56(e) (requiring that affidavits submitted in opposition to a motion for summary judgment be made on personal knowledge and set forth such facts as would be admissible in evidence). Even though the affidavit purports to be based on Stockell's "personal knowledge of the facts," the affidavit does not explain how Stockell had personal knowledge of the underwriter's decision-making process.

Assuming, however, that Stockell's affidavit is supported by personal knowledge, the Court concludes that Plaintiff has raised a factual dispute as to whether Defendant's influence

15

over SouthTrust in the lending decision caused her injury. Defendant put forth a declaration by its underwriter, Kathy Elder, in which she states that the errors on Plaintiff's credit report rendered the LP "caution" response void and that SouthTrust's decisions regarding whether and how much to loan were based strictly on its own manual underwriting of the loan. (Elder decl. at ¶¶ 8, 12.) Stockell's affidavit does not directly contradict the underwriter's declaration, as he does not dispute that the LP "caution" response was void. Stockell does, however, state that Defendant's underwriting requirements played a significant role in SouthTrust's decision to offer Plaintiff a smaller loan. This statement is sufficient to create a genuine issue for trial regarding whether Defendant's LP system caused Plaintiff to be denied the requested $80,000 loan.

### 2. Whether Plaintiff's Claims Are Barred by the Doctrine of Unclean Hands.

The Court next considers Defendant's argument that the doctrine of unclean hands bars Plaintiff's claims. "The equitable doctrine of unclean hands provides that one who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice, or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly within the law." *In re Garfinkle*, 672 F.2d 1340, 1347 (11th Cir. 1982) (quotations and citations omitted). On her loan application, Plaintiff represented that the Coronado Drive property would be her primary residence. (Pl.'s dep. at 84, 178-197, B-24, B-26, B-27; Doc. No. 74, Ex. P.) Yet, at her deposition on June 8, 2006, Plaintiff specifically testified that she bought the property so that her daughter could live there. (Pl.'s dep. at 84.)[10] She conceded at her

---

[10]In response to the question, "So when you applied for this loan, for the Coronado Drive property, the purpose of that was to obtain a property for your daughter Donna to live in?[,]" Plaintiff responded, "[y]es." (Pl.'s dep. at 84.) Plaintiff further testified:
    Question:    There is also an entry down here do you intend to occupy the

deposition that she applied for the loan in her name because she knew her daughter would not qualify for a loan because of her poor credit.[11]  Plaintiff later attempted to explain this deception through her affidavit dated September 20, 2006, in which she states that when she purchased the Coronado Drive property, she intended to live there "at some point," but her plans changed when her companion was killed in a car accident in 2003.  (Pl.'s aff. at 1-2.)

---

                    property as your primary residence, and that's marked yes, do you see that?
Plaintiff:      Yes.
Question:     And do you recall answering that question?
Plaintiff:      Yes.
Question:     And why did you answer yes to that questions when you were buying it for your daughter?
Plaintiff:      I think I had to do that in order to get the loan in my–to get the loan in my name.

(*Id.* at 178.)

[11]Plaintiff testified:
Question:     How did you learn about that piece of land or–
Plaintiff:      Oh, I had been–my daughter had been looking for a home, for a home to stay in.  And because of her credit, I applied for the loan.
. . .
Question:     Donna.  And you mentioned because of her credit, you applied for a loan?
Plaintiff:      Yes, for the loan, uh-huh.

(Pl's dep. at 83-84.)  Later, when asked why she applied for a smaller loan in the amount of $41,000, Plaintiff testified that she did not really want a loan as large as $80,000 because she was concerned that her daughter would not be able to keep up the payments:
Question:     . . . Why then this amount [$41,000]?
Plaintiff:      Because I was buying the property for my daughter and I was concerned about the payments and I wanted to bring down the payment as low as I could. . . .
. . .
Plaintiff:      . . . I was trying to make my daughter's monthly payment as little as I could so that we would be–I would feel safe knowing that she will be able to meet that monthly payment.

(*Id.* at 144-46.)

17

The Court rejects this affidavit as a post-hoc rationalization and vain attempt to cover-up Plaintiff's deception and to create an issue for trial. "A party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by . . . filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806, 119 S. Ct. 1597, 1603, 143 L. Ed. 2d 966 (1999). Furthermore, even accepting the September 2006 affidavit as true, it does not change the undisputed fact that, when Plaintiff applied for the loan and purchased the property, she did not intend to immediately occupy the property as her primary residence. The fact that Plaintiff did not intend to immediately occupy the property as her primary residence is significant because "non-owner occupied" or "investor" mortgages are far riskier than owner-occupied mortgages, and thus are not eligible for the same loans as owner-occupied properties. (Elder decl. at ¶ 11.) Plaintiff has not disputed the fact that her loan application would not have been approved, if it had been presented as an investment mortgage. Therefore, Defendant suffered injury the moment it received an investment property loan instead of the more valuable owner-occupied loan that it had bargained for.[12] Accordingly, the Court concludes that Defendant has shown that Plaintiff misrepresented facts on her application in order to secure the loan, and this deception bars her claims. *See Riggs Nat'l Bank of Washington, D.C. v. Linch*,

---

[12]Furthermore, the Court rejects Plaintiff's attempt to create a genuine issue for trial with her vague statements that she told SouthTrust that she planned to live in the Coronado Drive property "at some point after selling [her] Lutz home, which [she] had not yet put on the market" or that "SouthTrust did not require [her] to sell [her Lutz home] prior to closing." (Pl.'s aff. at ¶¶ 2-3.) Plaintiff does not state to whom or when she informed of this plan. Plaintiff's deposition testimony is abundantly clear that she purchased the home for her daughter to live in.

829 F. Supp. 163 (E.D. Va. 1993) (finding that the doctrine of unclean hands barred the plaintiff's ECOA claim because the plaintiff knowingly and willfully misrepresented his financial net worth in order to secure a loan).

## IV.     Conclusion

Although Plaintiff raised a factual dispute as to causation, her claims are barred by the applicable statutes of limitation and the doctrine of unclean hands.  Accordingly, the Court declines to consider Defendant's remaining arguments.  It is **ORDERED AND ADJUDGED** that Defendant Federal Home Loan Mortgage Corporation's Motion for Summary Judgment (Doc. No. 74) is granted.  The Clerk is directed to enter judgment in favor of Defendant Federal Home Loan Mortgage Corporation and to close this case.

**DONE AND ORDERED** at Tampa, Florida, this 6th day of March, 2007.


Copies to:
Counsel of Record

*Susan C. Bucklew*
SUSAN C. BUCKLEW
United States District Judge